ELLEN OWEN Et Al.

*vs.*

ELLEN KELLY.*

1. By the Act of Congress of February 10, 1855, an alien woman mar-
rying a citizen of the United States becomes a citizen by virtue of
her marriage.
2. The terms of the act apply to every woman of white blood married
at the time of its passage, or who should afterwards become mar-
ried to a citizen of the United States.

Equity No. 70.   Decided May 7, 1867.

Appeal from a decree in equity.

The Bill was filed to procure a partition or sale of the
real estate of Miles Kelly deceased.

The Facts are stated in the opinion.

Mr. Wm. John Miller for complainants.

Mr. R. J. Brent for defendants.

Mr. Justice Olin delivered the opinion of the Court:

The history of this case is briefly as follows: Miles Kelly,
a native of Ireland, emigrated to this country some twenty
years ago, settled in the District of Columbia, was natural-
ized in 1855, acquired property real and personal, inter-
married with Ellen Duffy, and died on the 2d day of March,
1862, intestate and without issue, but leaving surviving
him in the United States the said Ellen his widow, and his
two sisters Ellen Owen and Margaret Kahoe. His widow
Ellen Kelly claimed the residue of his estate after the pay-
ment of debts to the exclusion of his sisters Mrs. Owen and
Mrs. Kahoe, who it is contended are not entitled to take

*Affirmed in the Supreme Court of the United States.   See Owen
*vs.* Kelly, 7 Wall., 496.

any portion of the same as his heir-at-law. Upon a bill filed by the complainants below who are the appellants in this Court, the chancellor decreed in favor of the widow to the exclusion of the sisters. From this decree the appeal was taken.

The act of Congress upon which both the widow and the sisters found their claim is the Act of February 10, 1855, Section 2, which declares, "that any woman who *might* lawfully be naturalized under the existing laws, married, or who shall be married to a citizen of the United States, shall be deemed and taken to be a citizen." This provision is substantially a transcript of the 16th Section of 7 & 8 Victoria, chap. 66, except that the words "who might lawfully be naturalized under the existing laws" are interpolated in our act, and it is upon the construction of these words that this case depends.

It appears from the evidence that Mrs. Owen and Mrs. Kahoe came into this country from Ireland after they had arrived at the age of eighteen years, which made it necessary, in their cases, had they remained single under the laws existing anterior to the act of 1855, that they should declare their intention to become citizens at least two years prior to their application for admission to citizenship. It also appears that such declaration of intention never was made by either of them prior or subsequent to marriage. It also appears that at the time of the passage of the act of 1855 Mrs. Kahoe was the wife of a citizen of the United States, and that in 1861 Mrs. Owen became also the wife of a citizen of the United States. It also appears that the widow, Mrs. Kelly, was at the time of her coming into this country under the age eighteen years, so that no declaration of intention was necessary to be made in her case in order to entitle her to admission as a citizen, had she remained single and after five years residence in this country presented herself for naturalization.

The only difference in the cases of the sisters and of the widow so far as it relates to the right to take from Miles Kelly, is that the former came into the United States after they had arrived at eighteen years of age whilst the widow came here before she had arrived at that age. The decree of the Court below, therefore, decides that while the widow, Mrs. Kelly, comes within the meaning of the act of 1855 and is a woman, or was a woman, who might be lawfully naturalized under the laws existing prior to February 10, 1855, yet the sisters of the deceased, Mrs. Owen and Mrs. Kahoe, were or are women who might not be lawfully naturalized under the laws existing at that time.

We do not agree with that opinion. We think that the sister, as well as the widow of Miles Kelly, were, at the time of his decease, citizens of the United States, by virtue of their intermarriage with citizens.

The language of the act of February 10, 1855, is " any woman who might be lawfully naturalized under the existing laws." This word " lawfully " may and ought to be eliminated from this clause it being tautological and superfluous. The expression would then be " any woman who might be naturalized under the existing laws married " (at the time of the passage of the act) "or who shall be married " (after the passage of the act) " to a citizen of the United States shall be deemed and taken to be a citizen." Now, the word " might " is the preterite of the word " may," which, according to the best lexicographers simply means " to be possible," and " might " is defined by Webster as equivalent to " had power " or " was possible." The word " might " in the section in controversy has relation to the power or the ability of the woman to become a citizen under the laws existing prior to 1855. Now, let us see whether the sisters of the deceased when they were married had not the power or ability to obtain naturalization under the laws existing prior to 1855. Under those pre-existing laws any " alien

*25*

being a free white person" might (that is to say had the ability to) become a citizen of the United States by complying with the conditions prescribed by the law in that behalf. In the case of the sisters it is true that one more condition was necessary than in the case of the widow, to wit, the declaration of intention two years previous to application. But might they not have complied with that condition; that is to say, was it not possible for them to have made that declaration? The clause in controversy was intended to embrace in its provisions every woman of white blood who was then married or should afterwards become married to a citizen of the United States. It was intended to exclude no woman from citizenship whose husband was a citizen at the time of the passage of the act or should become so after its passage, except women of color.

The intention of Congress in passing the act of 1855 was to conform the law of naturalization to the common law principle of baron and feme which merged the existence of the wife in that of her husband and under the operation of that act nothing more is necessary to make an alien white woman a citizen than simply that she should intermarry with a citizen of the United States or be the wife of an alien who shall after her marriage become a citizen. The law of 1855 embraces the case of a white woman in Europe who marries there with a citizen of the United States or who marries an alien abroad if her husband shall come into this country and be naturalized no matter whether the woman herself has ever lived here or not. This must be so because it is possibe for any white woman to become naturalized under the law existing before the passage of the act in question. If the woman be white she may come into this country, may file her declaration, may reside here five years, may prove herself to be a woman of good moral character from the time of her coming here till her application for citizenship by acting in such character, may prove herself to be attached to the Constitution of the United States by

manifesting such attachment, may prove herself well disposed to the good order and happiness of the country by evincing such disposition, and finally may renounce her allegiance to any other dominion, which are the conditions required for citizenship.

We know it is argued that Congress only intended to substitute marriage for the final judicial act of a court of record in the formal admission to citizenship in passing the act of 1855, If such had been the intention it was very easy to have so expressed it. There seems to be no good reason why such should have been the intention. Why should Congress intend to qualify Mrs. Kelley to take the whole of her husband's estate simply because she came to this country one day before she was eighteen years old, whilst it would disqualify her from taking a single farthing had she come here the day after she had attained that age.

In the absence, therefore, of language clearly expressing such legislative intention, and in the absence of the least shadow of reason why such intention should have existed we are constrained to follow the way in which the plain philology of the Act of 1855 lead us, and to construe it to embrace within its comprehensive meaning not only the case of Mrs. Kelly but also the cases of Mrs. Owen and Mrs. Cahoe and to make citizens of them all. Under this construction Mrs. Kelly would be entitled to her share of the estate as the widow of Miles Kelly deceased, and the sisters, Mrs. Owens and Mrs. Cahoe would be entitled to the residue as his only heirs-at-law in this country at the time of the descent being cast.

Decree below reversed and a decree passed in accordance with this opinion.