*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-AA-0751

YAZAM, INC., D/B/A EMPOWER, PETITIONER,

v.

D.C. DEPARTMENT OF FOR-HIRE VEHICLES, RESPONDENT.

On Petition for Review of Orders of the
District of Columbia Office of Administrative Hearings
(2020-DFHV-000003)

(Argued October 3, 2023                    Decided February 29, 2024)

*Matthew M. Madden*, with whom *Lauren C. Andrews* was on the brief, for petitioner Yazam, Inc., d/b/a/ Empower.

*Dia Rasinariu*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General, were on the brief, for respondent.

Before BECKWITH, MCLEESE, and DEAHL, *Associate Judges*.

MCLEESE, *Associate Judge*: Petitioner Yazam, Inc., which does business as Empower, challenges rulings by the Office of Administrative Hearings ("OAH") (1) that Empower is a private vehicle-for-hire company subject to the regulatory authority of the D.C. Department of For-Hire Vehicles ("DFHV"), and (2) upholding a cease-and-desist order that DFHV issued to Empower. We uphold the ruling that

Empower is a private vehicle-for-hire company subject to DFHV's regulatory authority.  We reverse the cease-and-desist order.

## I.  Background

### A.  Factual Background

The parties stipulated to facts that included the following.  Empower's software can be used to book rides in automobiles.  Empower sells subscriptions to that software, and other related support services, primarily to drivers who wish to provide rides to passengers.  Subscribers must enter into a subscription agreement with Empower.  The standard subscription agreement was not submitted to OAH and is not before this court, but the parties stipulated to some of the provisions of that agreement.  The subscription agreement provides that drivers have "the sole right to determine when, where, how, how often, and for how long" drivers provide rides.  Drivers determine their own fares, and payments from passengers to drivers are processed through a third party not owned or controlled by Empower.  Drivers keep all of the fares and fees they charge passengers.

Passengers who use Empower's software to book rides must agree to Empower's acceptable-use policy.  That policy is not in the record.  Empower does not receive any payments from passengers who use its software.  Empower provides

email and phone support to drivers and passengers.

Empower requires drivers to provide information about the vehicle the driver uses and also requires drivers to undergo a background check conducted by a third party. Empower does not permit drivers to unilaterally change fares after accepting a request for a ride. Empower requires that drivers charge passengers a cancellation fee in some circumstances.

## B. Statutory and Regulatory Background

Vehicles for hire in the District of Columbia are regulated under the Taxicab Commission Establishment Act ("the Act"). D.C. Code § 50-301 et seq. Vehicles for hire are divided into public vehicles and private vehicles. *Id.* §§ 50-301.03(16A), (17). Operators of public vehicles for hire, such as taxicabs and limousines, are required to obtain special licenses, pay a license tax, and demonstrate their good moral character and their qualifications to operate their vehicle. D.C. Code §§ 50-301.03(17), -301.19; *id.* § 47-2829(d), (e). Operators and owners of public vehicles for hire are also subject to an extensive set of regulations, which address issues such as the marking of vehicles, nondiscriminatory provision of services, required equipment, annual vehicle inspection, standards of operator conduct, recordkeeping obligations, proof-of-insurance requirements, and operators' proof of good health. 31 D.C.M.R. §§ 503, 508, 608, 816, 818, 823, 900, 1003.

The Act also regulates private vehicles for hire. D.C. Code §§ 50-301.29a to .29g; 31 D.C.M.R. § 1900-07; *see also* 31 D.C.M.R. § 9901.1 (regulations use term "private sedan" as "synonymous with the term 'private vehicle-for-hire'" as defined in the Act). Regulation of private vehicles for hire under the Act is primarily directed in the first instance at "private vehicle-for-hire compan[ies]," rather than at individual operators. D.C. Code § 50-301.29a. Among other things, private vehicle-for-hire companies must maintain records of their operators and vehicles; disclose required information on their websites; verify detailed initial and annual safety inspections of vehicles; perform background checks on operators; ensure that their operators meet applicable requirements; register their operators; have a policy of zero-tolerance for use of alcohol, use of illegal drugs, and driving while impaired; have a policy forbidding discrimination in the provision of services; provide quarterly reports to DFHV; require their vehicles to display a consistent "trade dress consisting of a logo, insignia, or emblem"; disclose their fees to customers; and either maintain adequate insurance or verify that their operators do. *Id.* §§ 50-301.29a, .29c, .29d, .29f; 31 D.C.M.R. §§ 1903, 1905. Finally, private vehicle-for-hire companies must register with DFHV and periodically verify that they have met regulatory requirements. D.C. Code §§ 50-301.29a(12), .29g(a); 31 D.C.M.R. § 1902.

Some of the same requirements, and some additional ones, apply to companies, including public or private vehicle-for-hire companies, that "provide[]" or "use[]" "digital dispatch." D.C. Code § 50-301.31. "Digital dispatch" means "the hardware and software applications and networks, including mobile phone applications, which passengers and operators use to provide public and private vehicle-for-hire service." *Id.* § 50-301.03(8A). The additional requirements include provisions governing the disclosure and calculation of fares; an obligation to provide service throughout the entire District; and obligations to pay a percentage of gross receipts and a "congestion management fee" to the District. *Id.* § 50-301.31.

Operators of private vehicles for hire are directly subject to certain requirements. D.C. Code § 50-301.29e; 31 D.C.M.R. § 1904. They may "[a]ccept only rides booked through a private vehicle-for-hire company's digital dispatch and shall not solicit or accept street hails." D.C. Code § 50-301.29e(a)(1). They also are required to use the private vehicle-for-hire company's trade dress; have a valid driver's license issued by D.C., Maryland, or Virginia; have proof of insurance; and be at least twenty-one years old. *Id.* § 50-301.29e(a).

The principal issue in this case is whether Empower is a private vehicle-for-hire company subject to regulation under the Act. The Act defines "[p]rivate vehicle-for-hire" company as an organization "operating in the District that uses

digital dispatch to connect passengers to a network of private vehicle-for-hire operators." D.C. Code § 50-301.03(16B). A "[p]rivate vehicle-for-hire operator" is "an individual who operates a personal motor vehicle to provide private vehicle-for-hire service in contract with a private vehicle-for-hire company." *Id.* § 50-301.03(16C). As previously noted, DFHV's regulations use the term "private sedan" in place of "private vehicle-for-hire." 31 D.C.M.R. § 9901.1. Under the regulations, a "[p]rivate sedan business" is an organization "that uses digital dispatch to connect passengers to a network of operators of private sedans." *Id.* A "[p]rivate sedan operator" is "an individual who operates a personal motor vehicle to provide private sedan service . . . in association with a private sedan business." *Id.* "Private sedan service" is "a class of transportation service by which a network of private sedan operators . . . registered with a private sedan business . . . provides vehicle-for-hire service." *Id.* Finally, a "digital dispatch service" is "a dispatch service that provides digital dispatch for vehicles-for-hire." *Id.*

DFHV is authorized to investigate violations of the Act, to promulgate regulations, and to impose sanctions on companies and operators that fail to adhere to the Act or DFHV's regulations. D.C. Code §§ 50-301.07(c), .13(g), .29(a), .29g. DFHV can issue ex parte cease-and-desist orders if it "has reason to believe that a person is violating a provision of [Title 31 of the D.C.M.R.] or other applicable law and the violation has caused or may cause immediate and irreparable harm to the

public." 31 D.C.M.R. § 705.1. "A cease and desist order shall be in writing . . . and shall include," among other things, "[t]he grounds for the order, including a citation to the law or regulation that the respondent is violating." *Id.* § 705.2. The subject of such an order can seek a prompt hearing before OAH. *Id.* § 705.4.

## C. Procedural Background

DFHV issued an ex parte cease-and-desist order requiring Empower to immediately cease operations. The order stated that Empower had failed to register as required with DFHV. The order listed three provisions that DFHV believed Empower had violated: D.C. Code § 50-301.29a(12) (requiring private vehicle-for-hire companies to register with DFHV); 31 D.C.M.R. § 1605.1 (requiring digital dispatch services to register with DFHV); 31 D.C.M.R. § 1902.1 (requiring private sedan businesses to register with DFHV). Empower challenged the order before OAH, which granted summary judgment to DFHV.

Empower argued before OAH that Empower was not required to register with DFHV because Empower lacked the kind of contractual labor relationship necessary for Empower to be "in contract with" its subscribers. *See* D.C. Code § 50-301.03(16C) (defining "[p]rivate vehicle-for-hire operator" as "an individual who operates a personal motor vehicle to provide private vehicle-for-hire service *in contract with* a private vehicle-for-hire company") (emphasis added). OAH

concluded that Empower was required to register with DFHV. OAH reasoned that D.C. Code § 50-301.03(16C) does not require "that the contract between the operators and the company . . . create an employment or agency relationship between the parties to trigger the registration requirement." Rather, "[t]he only requirement is that there be a contractual relationship . . . that connects [Empower] to operators who provide vehicle-for-hire services." OAH determined that the subscription agreement between Empower and its subscribers satisfied the contractual-relationship requirement.

Empower also argued that in any event the cease-and-desist order was defective, because the order did not allege, and DFHV had not shown, any risk of immediate and irreparable harm to the public caused by Empower's failure to register with DFHV. OAH upheld the order. OAH acknowledged that the order "did not state that [Empower] had caused, or that DFHV believed that [Empower] may cause, immediate and irreparable harm to the public." OAH inferred, however, that DFHV must have believed there was at least a risk of such harm, because such a belief is a prerequisite under the applicable regulation to issuing a cease-and-desist order. *See* 31 D.C.M.R. § 705.1. OAH also concluded that the risk of immediate and irreparable harm was "patently obvious." Specifically, OAH explained that "[s]kirting the mechanism for DFHV to uniformly enforce safety and other requirements . . . may result in imminent and serious permanent injury to riders and

the general public." OAH therefore granted summary judgment to DFHV.

## II. Empower's Status as a Private Vehicle-For-Hire Company

The parties agree that whether Empower is a private vehicle-for-hire company turns on whether Empower's subscribers are "private vehicle-for-hire operators." *See* D.C. Code § 50-301.03(16B) (defining "private vehicle-for-hire company" as "an organization . . . that uses digital dispatch to connect passengers to *a network of private vehicle-for-hire operators*") (emphasis added). Empower argues that its subscribers are not private vehicle-for-hire operators, because they do not "operate[] a personal motor vehicle to provide private vehicle-for-hire service *in contract with a private vehicle-for-hire company*." D.C. Code § 50-301.03(16C) (emphasis added). We hold that Empower is a private vehicle-for-hire company.

### A. Standard of Review and Additional Background Legal Principles

This court will uphold a ruling by OAH unless the ruling is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C. Code § 2-510(a)(3)(A) (2001). "The proper construction of a statute raises a question of law . . . ." *Washington v. D.C. Dep't of Pub. Works*, 954 A.2d 945, 948 (D.C. 2008). This court generally reviews legal conclusions de novo. *Providence Hosp. v. D.C. Dep't of Emp't Servs.*, 855 A.2d 1108, 1111 (D.C. 2004).

"[W]e accord appropriate weight to the interpretation of a statute by the agency which is charged with its enforcement, and which therefore ordinarily has specialized expertise . . . ." *Washington*, 954 A.2d at 948. Neither party argues that this court should afford deference to OAH's legal determinations. *See Vizion One, Inc. v. D.C. Dep't of Health Care Fin.*, 170 A.3d 781, 791 (D.C. 2017) (OAH "lacks the subject-matter expertise justifying the deference to agency interpretations of statutes or regulations") (internal quotation marks omitted).

DFHV argues that this court should defer to DFHV's conclusion that Empower is a private vehicle-for-hire company subject to regulation by DFHV. Empower does not dispute that this court ordinarily should give deference to DFHV's interpretation of statutes that DFHV enforces. Rather, Empower argues that such deference is not warranted in this case because DFHV's interpretation is contrary to the plain meaning of the pertinent provisions and because DFHV's interpretation is not reasonable. Because we agree with DFHV's interpretation, we need not address the question whether that interpretation would be entitled to deference.

When interpreting statutes, "[w]e first look to see whether the statutory language at issue is plain and admits of no more than one meaning." *In re Macklin*, 286 A.3d 547, 553 (D.C. 2022) (internal quotation marks omitted). "The meaning—

or ambiguity—of certain words or phrases may only become evident when placed in context. Therefore, we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them." *Id.* (internal quotation marks omitted). "We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. Statutory interpretation is a holistic endeavor." *Id.* (internal quotation marks omitted).

Generally, "[w]e will give effect to the plain meaning of a statute when the language is unambiguous and does not produce an absurd result." *In re Macklin*, 286 A.3d at 553 (internal quotation marks omitted). The plain meaning of a statute may not be controlling, however, when there is a "clearly expressed legislative intention to the contrary." *Hensley v. D.C. Dep't of Emp. Servs.*, 283 A.3d 123, 127 (D.C. 2022) (internal quotation marks omitted). "We consider statutory context and structure, evident legislative purpose, and the potential consequences of adopting a given interpretation." *In re Macklin*, 286 A.3d at 553 (brackets and internal quotation marks omitted). "We may also look to the legislative history to ensure that our interpretation is consistent with legislative intent." *Id.* (internal quotation marks omitted).

## B. Plain Language

Empower and DFHV both argue that they are entitled to prevail based solely on the plain meaning of D.C. Code § 50-301.03(16C). On that point, we do not agree with either party.

Before OAH, Empower argued that a private vehicle-for-hire driver is "in contract with" a company within the meaning of the Act only if the driver providing vehicle-for-hire service has a contractual labor relationship with the company, such as employer/employee or independent contractor, with respect to that service. In this court, Empower abandons that position, instead arguing that the contract between the driver and the company "must be for the operator's provision of private vehicle-for-hire services" "on behalf of the company." We do not believe that Empower's position is dictated by the plain meaning of D.C. Code § 50-301.03(16C). For example, imagine that a real-estate company and a former employee enter into a contract pursuant to which (1) the company agrees to waive a prior non-compete clause; (2) the former employee agrees to pay the company a monthly fee for the right to work as a real-estate agent; and (3) the former employee agrees to other significant limitations regarding the way in which the former employee will operate as a real-estate agent. In this scenario, the real-estate agent is not providing services strictly on the company's behalf, at the company's direction,

or with the goal of collecting wages or other payments from the company. Nevertheless, the contractual relationship between the agent and the company sufficiently affects the agent's ability to offer services such that those services could reasonably be said to have been provided "in contract with" the company.

DFHV argues that D.C. Code § 50-301.03(16C) unambiguously requires only "a contractual relationship between drivers and the company that connects them to passengers seeking vehicle-for-hire services." On that view, however, Meta would apparently be a private vehicle-for-hire company, subject to regulation by DFHV, if drivers used Facebook Messenger or some other general Meta application to connect with passengers. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 786 (N.D. Cal. 2022) ("When individuals sign up for a Facebook account, they agree to Meta's Terms of Service, Data Policy, and Cookies policy. These policies are contractually binding on both Meta and its users.") (citation omitted). We do not view D.C. Code § 50-301.03(16C) as unambiguously sweeping so broadly. We therefore must turn to additional considerations.

## C. Statutory Structure and Purpose

The contract between Empower and its subscribers is designed to enable drivers to use digital dispatch to connect with passengers and give them rides in private vehicles for hire. We conclude from the Act's structure and purpose that

Empower therefore is properly viewed as a private vehicle-for-hire company subject to DFHV's regulation under the Act.

Read as a whole, the Act seems intended to comprehensively regulate the business of operating vehicles for hire, whether by private vehicles or public vehicles. We view it as highly implausible that the D.C. Council intended to permit individual drivers to provide rides for hire without being subject to the extensive requirements of the Act intended to protect public safety and other important interests, such as the nondiscriminatory provision of service. As previously explained, the Act imposes those requirements directly on the operators and owners of public vehicles for hire. D.C. Code §§ 50-301.03(17), -301.13, -301.19; *id.* § 47-2829(d), (e); 31 D.C.M.R. §§ 503, 508, 608, 816, 818, 823, 900, 1003.

The Act operates differently with respect to drivers of private vehicles for hire. The Act does not seem to contemplate that such a driver could permissibly operate as a lone individual. Rather, such a driver may "[a]ccept only rides booked through a private vehicle-for-hire company's digital dispatch and shall not solicit or accept street hails." D.C. Code § 50-301.29e(a)(1). The Act then requires private vehicle-for-hire companies to ensure their drivers' compliance with extensive safety and other requirements. D.C. Code §§ 50-301.29a, .29c, .29d, .29f, 29g(a); 31 D.C.M.R. §§ 1902, 1903, 1905.

We decline to adopt a reading of the Act that would leave unregulated the activities of Empower and its subscribers/drivers in providing rides to passengers in vehicles for hire. *See generally, e.g.*, *Muscarello v. United States*, 524 U.S. 125, 136-37 (1998) (declining to adopt interpretation of statute that would "leav[e] a gap in coverage that [the Supreme Court] d[id] not believe Congress intended"); *United States v. 6640 S.W. 48th St.*, 41 F.3d 1448, 1453 (11th Cir. 1995) (declining to adopt interpretation of statute that would create "a gaping loophole in an intentionally comprehensive" statute).

We need not determine in this case the precise scope of the phrase "operate[] a personal motor vehicle to provide private vehicle-for-hire service in contract with a private vehicle-for-hire company." D.C. Code § 50-301.03(16C). For present purposes it suffices to conclude, as we do, that this statutory language comfortably applies to the contract between Empower and its subscribers. That contract requires Empower to provide digital-dispatch services to its subscribers/drivers so that the drivers can give rides to passengers in private vehicles for hire. Nothing more is required in our view to make Empower subject to regulation under the Act.

## D. Legislative History

DFHV argues that the legislative history of the Act supports the conclusion that Empower is a public vehicle-for-hire company. Empower argues to the contrary

that the legislative history of the Act does not shed meaningful light on that issue. We need not address that dispute. Rather, we assume without deciding that Empower is correct that the legislative history sheds no light on the issues before the court. For the reasons we have already stated, we nevertheless uphold DFHV's determination that Empower is a private vehicle-for-hire company subject to regulation by DFHV.

### III. Cease-and-Desist Order

Empower argues that OAH erred in upholding DFHV's cease-and-desist order. We agree.

### A. Standard of Review

"We review orders granting summary judgment de novo." *PHCDC1, LLC v. Evans & Joyce Willoughby Tr.*, 257 A.3d 1039, 1042 (D.C. 2021). "Summary judgment is only appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted). "We review the record in the light most favorable to the party opposing summary judgment." *Id.* at 1042-43.

OAH granted summary judgment to DFHV. We hold to the contrary that Empower was entitled to summary judgment, because DFHV did not present OAH

with substantial evidence in support of the cease-and-desist order. *See generally, e.g.*, *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180-81 (D.C. 2006) (court will uphold OAH ruling if ruling is supported by "substantial evidence"; "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotation marks omitted).

## B. Preliminary Matters

Before turning to whether DFHV provided substantial evidence to support the cease-and-desist order, we briefly discuss several preliminary matters. First, Empower suggests that the cease-and-desist order was facially invalid because the order (1) did not explicitly state that DFHV had reason to believe that Empower's failure to register "may cause immediate and irreparable harm"; and (2) stated no grounds that would support such a belief. *See* 31 D.C.M.R. § 705.2 ("A cease and desist order shall be in writing . . . and shall include," among other things, "[t]he grounds for the order, including a citation to the law or regulation that the respondent is violating."). DFHV argues that the order contained the required information. We need not address that dispute. Rather, we assume (favorably to DFHV), without deciding, that the order was facially adequate and could properly have been upheld by OAH if supported by sufficient evidence.

Second, as previously noted, DFHV is authorized by regulation to issue a cease-and-desist order if DFHV "has reason to believe that a person is violating a provision of [Title 31 of the D.C.M.R.] or other applicable law and the violation has caused or may cause immediate and irreparable harm to the public." 31 D.C.M.R. § 705.1. That regulation is not entirely clear as to whether the words "reason to believe" modify not only the words "is violating" but also the words "the violation has caused or may cause immediate and irreparable harm." Without explicitly briefing the issue, the parties appear to assume that "reason to believe" modifies both phrases, so that it would be sufficient if DFHV had reason to believe that Empower's failure to register "may cause immediate and irreparable harm." We therefore assume the same, without deciding the issue.

Third, the phrase "reason to believe" in the regulation is not entirely clear. For example, that phrase sometimes is equated with "articulable suspicion," a standard that is less demanding than probable cause. *E.g.*, *Joseph v. United States*, 926 A.2d 1156, 1160-61 (D.C. 2007). At other times, the phrase (or slight variants of it) is equated with probable cause. *E.g.*, *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt . . . .") (internal quotation marks omitted). The parties in this case have not briefed the question of how to interpret the phrase "reason to believe" in the current context, and this court has not previously addressed that issue.

For current purposes, we assume (favorably to DFHV), without deciding, that "reason to believe" requires less than probable cause and instead is roughly equivalent to "articulable suspicion." *See, e.g.*, *Robinson v. United States*, 76 A.3d 329, 336 (D.C. 2013) ("The reasonable, articulable suspicion standard requires substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence. It is not onerous, but it is not toothless either. . . . Unparticularized suspicion and inarticulate hunches are not sufficient . . . .") (citations and internal quotation marks omitted).

Fourth, it is undisputed that there was no evidence that Empower's failure to register actually caused immediate and irreparable harm to the public. We therefore focus our discussion on whether DFHV had reason to believe that Empower's failure to register "may cause" such harm.

Fifth, the meaning of the word "may" in the phrase "may cause" is not entirely clear. Depending on context, "may" can have a wide range of meanings, from probably to merely possible. *See, e.g.*, *Corn Prods. Refin. Co. v. Fed. Trade Comm'n*, 324 U.S. 726, 738 (1945) (under federal antitrust statute, "the use of the word 'may' was not to prohibit [conduct] having the mere possibility [of lessening competition], but to reach [conduct] which would probably have [that] effect"); *Due S., Inc. v. Dep't of Alcoholic Beverage Control*, 197 P.3d 82, 89 (Utah 2008)

(interpreting "may endanger" to "require[] proof of reasonable likelihood of harm" rather than "speculative possibility of harm"); *Ctr. for Biological Diversity v. Cal. Fish & Game Comm'n*, 166 Cal. App. 4th 597, 610 (Ct. App. 2008) (equating "may be" with "substantial possibility," which is more than "reasonable possibility"); *State v. Hubble*, 206 P.3d 579, 584 (N.M. 2009) (equating "may be" with "reasonable possibility"); *Owen v. Kelly*, 6 D.C. (1 Mackey) 191, 193 (D.C. 1867) ("[A]ccording to the best lexicographers [the word 'may'] simply means 'to be possible' . . . .").

The parties have not briefed the question of how to interpret the term "may" in the present context, and this court has not previously addressed the issue.  We need not definitively resolve that issue in this case.  We do hold, however, that an ex parte cease-and-desist order cannot permissibly be issued simply because there is a possibility, no matter how small, that a violation might cause immediate and irreparable harm.  We so hold because the issuance of an ex parte cease-and-desist order requiring companies and/or individuals to immediately cease engaging in their businesses and/or employment is a form of extraordinary relief, similar to a temporary restraining order.  *Cf., e.g.*, *Timberline Helicopters, Inc. v. United States*, 140 Fed. Cl. 117, 120 (2018) ("A temporary restraining order is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (internal quotation marks omitted);

*Ramirez v. Salvaterra*, 232 A.3d 169, 184 (D.C. 2020) (injunction is "extraordinary remedy") (internal quotation marks omitted); Harold S. Blumenthal & Samuel Wolff, 2 *Securities Law Handbook* § 36.36 (July 2023 update) (statutory power of Securities and Exchange Commission to issue ex parte cease-and-desist orders "mimics in many respects the procedure for the entry of a temporary restraining order in the federal courts"; describing House Committee report explaining that "a temporary cease and desist order entered on an ex parte basis [is] an extraordinary remedy") (internal quotation marks omitted). We conclude that it would be unreasonable to interpret 31 D.C.M.R. § 705.1 to permit DFHV to issue an ex parte cease-and-desist order based on the mere possibility, no matter how speculative, that a violation might cause immediate and irreparable harm. *Cf. Ramirez*, 232 A.2d at 184 (to support issuance of injunction, "the injury or threat of injury must be real and immediate, not conjectural or hypothetical") (internal quotation marks omitted). We thus hold that, at a minimum, an ex parte cease-and-desist order issued by DFHV must be based on a reasonable possibility of immediate and irreparable harm.

Finally, neither party clearly addresses whether the validity of the cease-and-desist order should be assessed based solely on the information known to DFHV at the time the order was issued or instead should be assessed based on the information before OAH. DFHV, however, appears to assume that the validity of the order could be established based on information that DFHV was not aware of at the time of the

issuance of the order. For current purposes, we assume without deciding that DFHV's assumption on that point is correct.

### C. Analysis

As previously noted, the cease-and-desist order did not assert that DFHV had reason to believe that Empower's failure to register may cause immediate and irreparable harm. DFHV did not request an evidentiary hearing before OAH and did not provide OAH with any evidence directly addressing whether Empower's failure to register may cause immediate and irreparable harm. The parties did agree to a stipulated set of facts, but none of those stipulated facts directly addresses the issue of immediate and irreparable harm.

In opposing Empower's motion for summary judgment, DFHV argued that the public could potentially be harmed if Empower is "allowed to operate without complying with the many safeguards contemplated by the law." DFHV did not present OAH with any evidence, however, that Empower or its subscribers were not in fact complying with those safeguards (other than registration itself). DFHV did allege that there had been thousands of complaints about Empower, including hundreds from passengers who had "negative experiences with drivers." DFHV did not further explain the nature of those complaints and did not argue that such complaints were evidence of irreparable harm. A listing of complaints was attached

as an exhibit to DFHV's opposition, and the complaints include items such as "Map issues" and "Poor experience (general)." None of the complaints are described in a way that would reasonably be viewed as giving rise to a risk of irreparable harm.

In upholding the cease-and-desist order, OAH did not rely on the information DFHV submitted about complaints. DFHV also does not rely on that information in this court. DFHV's decision not to rely on that information is prudent, because the information did not provide a reasonable basis to fear irreparable harm. It appears to be undisputed that Empower has provided over two million rides in the District of Columbia to over one hundred and fifty thousand riders. Nevertheless, DFHV's list of complaints does not appear to contain a single complaint that is suggestive of irreparable harm. The complete absence of such a complaint in our view substantially undermines DFHV's contention that there was a reasonable basis to fear immediate and irreparable harm to the public if Empower was not ordered to immediately cease its operations. *Cf., e.g.*, *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1253 (10th Cir. 2017) (denying injunction because plaintiff's "speculative assertions [were] insufficient to carry [plaintiff's] burden"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 58-59 (D.D.C. 2021) (denying injunction where plaintiffs "never actually point to evidence suggesting that [irreparable harm] is likely") (emphasis omitted); *Tank Connection, LLC v. Haight*, 161 F. Supp. 3d 957, 967 (D. Kan. 2016) (denying injunction where

plaintiff failed to show sufficient risk of irreparable harm, given (among other things) absence of evidence of actual harm in preceding two years).

Rather than providing concrete evidence, DFHV relies entirely on the general idea that registration is the mechanism by which DFHV enforces important safety and consumer-protection requirements. That is true, but DFHV did not provide OAH with any support for a reasonable belief that Empower and its subscribers were not in fact complying with those requirements. In this court, DFHV does (1) refer in passing to a lawsuit filed against Empower after OAH's ruling in this case and (2) ask the court to take judicial notice of a statement that according to DFHV indicates that Empower acknowledged on its website that it does not provide insurance to drivers. We decline to consider those materials. *See, e.g.*, *Friends of McMillan Park v. D.C. Zoning Comm'n*, 211 A.3d 139, 148 (D.C. 2019) ("Our review, however, is limited to the evidence in the administrative record before the agency."). In any event, it does not appear that private vehicle-for-hire companies are required to provide insurance to operators if operators have their own insurance. D.C Code § 50-301.29c(d); 31 D.C.M.R. § 1905.5.

DFHV's argument, moreover, seems to overlook the requirement that the violation at issue "may *cause*" irreparable harm. 31 D.C.M.R. § 705.1 (emphasis added). The mere lack of registration would not ordinarily be viewed as in itself

causing either (1) other violations or (2) injuries that resulted from such other violations. *Cf., e.g.*, *Richardson v. Gregory*, 281 F.2d 626, 629 (D.C. Cir. 1960) ("A simple breach of duty having no causal connection with the injury cannot produce legal responsibility. The car in question may lack automobile registration tags—a clear violation of statute or regulations—but this omission could hardly be a proximate cause or contribute to injury in a legal sense; hence it is of no consequence.").

We understand the legitimate concern that a private vehicle-for-hire company's failure to register could interfere with DFHV's ability to obtain information that DFHV would need in order to determine whether the company was in fact complying with applicable safety and consumer-protection requirements. The difficulty in this case, however, is that—despite having months to do so while the matter was pending before OAH—DFHV never produced any evidence that Empower's failure to register was actually in any way impeding DFHV's ability to monitor Empower's activities. In the absence of such evidence, affirming the cease-and-desist order in this case would require this court to effectively adopt a per se rule that any failure to register justifies the extraordinary remedy of an initially ex parte cease-and-desist order. We decline to take that step.

For the foregoing reasons, we uphold OAH's determination that Empower is a private vehicle-for-hire company subject to DFHV's regulation, but we reverse OAH's order upholding the cease-and-desist order.

*So ordered.*